UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DR. IRA WARHEIT D.D.S.,                                :

                       Plaintiff,            :        02 Civ. 7345   (PAC)

              - against -                :        MEMORANDUM
                                          OPINION & ORDER

THE CITY OF NEW YORK, THE NEW YORK CITY
HEALTH AND HOSPITAL CORP., BELLEVUE            :
HOSPITAL CENTER, & NEW YORK CITY FIRE
DEPARTMENT/EMERGENCY SERVICES DIVISION,   :
NEW YORK CITY POLICE DEPARTMENT,
DR. ANTONIO ABAD MD., & P.O. SIEV,                  :

                      Defendants.           :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

HONORABLE PAUL A. CROTTY, United States District Judge:

This action arises from an unfortunate incident on September 13, 2001, when

Plaintiff Dr. Ira Warheit ("Dr. Warheit"), who wanted to volunteer at Ground Zero, was removed

from Ground Zero by a New York City police officer, placed in an ambulance, and transported to

Bellevue Hospital Center ("Bellevue"), where he was involuntarily committed under the New York

Mental Hygiene Law for a period of five days.  Plaintiff brings this action pursuant to 42 U.S.C. §

1983 against the City of New York, its police officers, and its hospital system,[1] claiming that his

_____

[1]  Plaintiff's Complaint originally named three additional defendants, Dr. Hallie Lightdale, Dr.
Anand Pandya and Dr. Zev Levine, all of whom are physicians at Bellevue who participated in the
evaluation and commitment of Dr. Warheit to Bellevue on September 13, 2001.  All claims against these
three individual defendants were voluntarily withdrawn on September 20, 2005.

1

removal from Ground Zero and his subsequent admission to Bellevue violated his civil rights.[2]

**BACKGROUND**

I. Underlying Facts

When Dr. Warheit, a New York-licensed periodontist, returned from his morning jog on September 11, 2001, the doorman at his apartment on West 42d Street informed him of the terrorist attacks at the World Trade Center. (Shaw Decl., Ex. 2, at 1; Id., Ex. 4, ¶ 2.)  Believing that his dental training and his field dental experience in Vietnam could be of use in the recovery effort, Dr. Warheit immediately went upstairs to his apartment, changed out of his running clothes, and proceeded to lend assistance. (Id.; Ex. 2, at 1)  He spent the day of the attack volunteering at the triage center, set up at Chelsea Piers, located on 21st to 23rd Streets, along the West Side Highway. (Warheit Dep. 54:20-21, May 21, 2004.)

The next day, September 12, 2001, Dr. Warheit continued to volunteer.  This time, Dr. Warheit went to the trauma center, which had moved south to Stuyvesant High School ("Stuyvesant"); located at Chambers Street and the West Side Highway. (Id. 68:9-10.)  One day after the terrorist attack, access to Ground Zero had not been formalized.  Certainly, the public did not have access, but "official" identification was not required; volunteers would show up at the trauma center, state their qualifications, and be put to work. (Id. 69:3-73:5.)  At the request of a coordinator at the Stuyvesant triage center, Dr. Warheit joined a work party of ten and spent all day passing out masks and supplies to the workers at Ground Zero. (Id. 73:15-74:16.)  He also worked on a bucket brigade at Ground Zero.  Apparently, he performed no medical or dental work on

---

[2]  Plaintiff also brings various claims under New York law.  Because the Court finds that Plaintiff has failed to make out a federal cause of action, however, the Court declines to exercise supplemental jurisdiction over the remaining state-law claims.

September 12, 2001.

On the morning of September 13, 2001, Dr. Warheit returned to the Stuyvesant triage center. By this time, the National Guard had begun to provide Ground Zero perimeter security, in addition to the New York City Police. Individuals were not permitted access to Ground Zero without proper identification. When Dr. Warheit arrived at the Chambers Street checkpoint, he was refused access. (Id. 88:21-89:7.) Dr. Warheit explained that he was a medical volunteer, so the checkpoint guards allowed him to proceed to the Stuyvesant High School trauma center to see if he could get an identification badge. (Id. 89:8-11.)

When Dr. Warheit arrived at Stuyvesant, he asked to speak with the medical person in charge, and was directed by the man at the registration desk to a doctor whose name and identity Dr. Warheit does not know. (Id. 89:13-90:6.) This unidentified doctor directed Dr. Warheit to Dr. Antonio Abad, M.D., a licensed psychiatrist who was also volunteering at the Stuyvesant trauma center.[3] (Id. 90:6-17.) Dr. Warheit approached Dr. Abad and started to explain his situation, but Dr.

---

[3] It is unclear whether the physician who ordered Dr. Warheit removed from the Stuyvesant trauma center on September 13, 2001 was actually Dr. Abad. Dr. Warheit insists that the man he spoke to was Dr. Abad. Two witnesses also identified the man who removed Dr. Warheit as the man known at the trauma center to be Dr. Abad. (See Warheit Decl., Exs. 3 & 6.) Dr. Abad insists that he never met Dr. Warheit at the Stuyvesant trauma center or ordered a police officer to remove Dr. Warheit and take him to Bellevue. (Abad Dep. 40:21-44:5, Sept. 10, 2004.) He also testified at his deposition that, while he knew several people were removed by police from Ground Zero, he was not involved in any of the removals and never sent anyone to Bellevue. (Id. 48:16-18, 49:17-19.)

Further, Dr. Abad is described as a Caucasian male, approximately 6'3" tall, with a distinct Spanish accent. (Abad Aff. ¶¶ 2-4.) Lieutenant Siev described the man who approached him about removing Dr. Warheit as a male of Indian-descent, slightly shorter than 5'8", with dark skin and a slight accent. (Siev Dep. 11-13.) Based on this inconsistency, Defendants now suggest mistaken identity, claiming that Dr. Abad was never involved in the incident of which Dr. Warheit complains. Because the Court must draw all reasonable inferences in the light most favorable to the non-moving party, however, the Court assumes that the individual who ordered Dr. Warheit's removal from the Stuyvesant trauma center was Dr. Abad.

Abad stopped him and started asking him questions, the substance of which Dr. Warheit cannot recall. (Id. 90:17-21.) Dr. Warheit does remember, however, that Dr. Abad asked about his psychiatric history, and at some point in the conversation Dr. Warheit revealed that he had been previously been under the care of Dr. Cancro, one of Dr. Abad's colleagues. (Id. 90:23-91:8.) Dr. Abad then mentioned that he would like Dr. Warheit to go to Bellevue for observation. (Id. 91:10-12.)

After speaking for a couple of minutes, Dr. Abad excused himself. He returned accompanied by Lieutenant David Siev ("Lieutenant Siev"), a New York City police officer assigned to triage center security. (Siev Dep. 25:13-18, Sept. 10, 2004.) There is some dispute about what happened after Lieutenant Siev approached. Dr. Warheit claims that when he tried to explain his situation, Lieutenant Siev physically restrained him without giving him an opportunity to leave peacefully. (Warheit Dep. 94:14-95:10.) Lieutenant Siev disagrees. According to Lieutenant Siev, Dr. Abad approached him asking for assistance and explaining that "there was someone in . . . the trauma center, that was not a doctor who thinks he's a doctor and was causing a disturbance." (Siev Dep. 11:17-20.) Lieutenant Siev walked over and observed Dr. Warheit "rambling about stuff" incoherently, "talking about one thing or another and the sentences didn't follow each other in a logical pattern." (Id. 11: 24-25, 12:6-9.) Lieutenant Siev told Dr. Warheit to leave several times, but Dr. Warheit refused. (Id. 12:14-15, 13:4-9.) Lieutenant Siev then used physical force to remove Dr. Warheit from the building. (Id. 13:5-16.)

Lieutenant Siev grabbed Dr. Warheit's wrists, placed them behind his back, and escorted him out of the trauma center. (Warheit Dep. 95:11-104:17.) While Dr. Warheit was never placed in handcuffs, Dr. Warheit alleges that Siev treated him roughly, twisting his arm behind his

back and, at one point, hitting him in the chest, though Dr. Warheit admits that this likely because he was walking bent over and Lieutenant Siev wanted him to straighten up. (Id.) Lieutenant Siev explains that he escorted Dr. Warheit out of the building in this manner "to protect [himself]," since he understood Dr. Warheit to be a mental patient who had just created a disturbance at the trauma center and did not want to leave. (Siev Dep. 11:18-14:20.)

Frank Fasano ("Fasano"), a certified nurse and paramedic who was also volunteering at the Stuyvesant trauma center on September 13, 2001 witnessed the entire incident. (Fasano Aff. ¶¶ 6, 8-9.) He first saw Dr. Warheit talking with Dr. Abad, whom he described as "a large man about 6'3" with an accent." (Id. ¶ 8.) According to Fasano, the interaction between Dr. Warheit and Dr. Abad was not peaceful. Dr. Abad was "clearly agitated" through the interaction, "berate[ing] and criticize[ing]" Dr. Warheit "in a loud, rude, derogatory and inflammatory fashion," and then ordering Lieutenant Siev to arrest Dr. Warheit because he was a "delusional psychotic." (Id. ¶¶ 8-9.) Fasano described Dr. Warheit as "a bit overwhelmed," but calm enough to permit Lieutenant Siev to escort him out of the building "peaceably." (Id. ¶ 10.) In fact, Fasano described the interaction between Dr. Warheit and Lieutenant Siev as so peaceful that he "didn't know that [Dr. Warheit] was being taken away." (Fasano Dep. 82:17-18, June 14, 2005.)

Once out of the building, Lieutenant Siev brought Dr. Warheit to one of the many ambulances waiting outside the trauma center. Dr. Warheit climbed inside the back section of the ambulance peacefully, without any assistance. (Warheit Dep. 104:18-21.) Lieutenant Siev did not get in the ambulance with Dr. Warheit and no one restrained Dr. Warheit in any way. (Id. 105:3-14, 106:12-21.)

At Lieutenant Siev's request, the ambulance driver took Dr. Warheit to the emergency room at Bellevue. (Siev Dep. 14:9-16.) Lieutenant Siev claims that he sent Dr. Warheit to Bellevue at his own request, explaining that while he was escorting Dr. Warheit out of the Stuyvesant trauma center, Dr. Warheit told Dr. Abad that he was "getting treated at Bellevue" and wanted "to "go back" to Bellevue." (Id. 13:21-14:16.) Dr. Warheit claims that he never instructed Dr. Abad or anyone else to take him to Bellevue, and that it was Dr. Abad's idea to send him there. (Warheit Dep. 107:1-3; Pl's Local Rule 56.1 Statement Corrected ¶¶ 49, 51) While Dr. Warheit now suggests that he told the ambulance driver he had a treating physician at NYU Medical Center and demanded that the driver take him there instead, during his deposition he testified that he never told the ambulance driver not to take him to Bellevue. (Pl.'s Local Rule 56.1 Statement ¶¶ 49, 51; Warheit Dep. 106:22-25.)

The ambulance arrived at Bellevue around 11:30 a.m. (Najib Decl., Ex. L (Bellevue Medical Records).) Dr. Warheit left the ambulance of his own volition, but then refused to go inside the hospital with Dr. Lightdale, one of the psychiatrists at Bellevue, because he had a "subjective feeling" that once he was inside he "wouldn't be let out." (Warheit Dep. 108:19-23.) Dr. Warheit was agitated and would not enter the hospital or answer Dr. Lightdale's questions, so Dr. Warheit was placed in restraints and given Haldol, a powerful antipsychotic drug, to calm him down.[4] (Najib Decl., Ex. L.)

During his initial interview with Dr. Lightdale, Dr. Warheit admitted to a prior history of Bipolar Disorder that had required a psychiatric hospitalization in 1997. (Id.) He also

---

[4] Dr. Lightdale's affidavit claims that Dr. Warheit was restrained and given Haldol because he was aggressive, threatening, and completely uncooperative. Dr. Warheit claims, on the other hand, that while he may have been angry, he was not threatening or aggressive.

admitted that he was previously on Paxil and Depakote, anti-psychotic medications, but had not take them for years. (Id.)  In light of this history, Dr. Lightdale determined that Dr. Warheit was suffering from a manic episode.

Dr. Warheit repeatedly demanded to leave Bellevue.  The records indicate that on September 13, 2001 Bellevue called Dr. Cancro, the head of psychiatry at Bellevue, and one of Dr. Warheit's treating physicians.  Dr. Cancro confirmed that Dr. Warheit has a long history of Bipolar Disorder with aggressive manic episodes. (Id.)  Based on the information provided over the phone, Dr. Cancro recommended that Dr. Warheit be admitted to Bellevue and started on Depakote. (Id.)  At 2:45 p.m. on the afternoon of September 13, 2001, Dr. Lightdale and Dr. Mtrevski admitted Dr. Warheit to Bellevue involuntarily, pursuant to New York Mental Hygiene Law § 9.39, in accordance with their determination that Dr. Warheit suffered from a mental illness that was likely to result in serious harm to himself or others if immediate care was not provided. (Id.)

Dr. Warheit petitioned the court for release from Bellevue. (Id.)  On September 18, 2001, a hearing was held at Bellevue to determine whether Dr. Warheit was in need of involuntary hospitalization. (Id.)  The State Supreme Justice presiding at the Mental Hygiene hearing ordered Dr. Warheit's release. (Id.)  Dr. Warheit claims severe and ongoing emotional trauma resulting from his arrest and subsequent involuntary commitment at Bellevue.

After his release, Dr .Warheit wrote to the New York Commission on Quality of Care for the Mentally Disabled complaining that he was unnecessarily detained at the hospital, improperly medicated and placed in restraints, and had false testimony offered in court by attending physician Dr. Anand Pandya during his retention hearing. (Najib Decl., Ex. J.)  The Commission investigated, reviewed Dr. Warheit's admission and treatment records, and interviewed the clinical

staff involved in his care. (Id.).  The Commission found no evidence to support Dr. Warheit's

allegations. (Id.)  Instead, the Commission concluded that "several Board certified psychiatrists, and

numerous other hospital staff, consistently documented behavior by Dr. Warheit after his arrival at

[Bellevue] which was adequate to reasonably require his evaluation . . . and emergency admission to

inpatient psychiatry." (Id.)  The Commission found no cause to question the decisions of the

Bellevue staff. (Id.)

## II. PROCEDURAL HISTORY

Dr. Warheit filed a written notice of claim on the City Defendants within 90 days of

being released from Bellevue (Najib Decl., Ex. B ("Notice of Claim")); and commenced this action

on August 29, 2002.  His Complaint alleges false arrest, use of excessive force, false imprisonment,

and cruel and unusual punishment in violation of his Fourth and Eighth Amendment rights, as well

as malicious prosecution, medical malpractice, negligence, defamation, prima facie tort, and

intentional infliction of emotional distress in violation of New York state law. (Compl. 36-42.)  Dr.

Warheit named as defendants the City of New York (the "City"), the New York City Health and

Hospitals Corporation ("HHC"), Bellevue Hospital Center ("Bellevue"), the New York City Fire

Department's Emergency Services Division, the New York City Police Department, and Lieutenant

David Siev ("Lieutenant Siev"), as well as three individual Bellevue physicians who have since

been released from the action. (Id. ¶ 1.)  After extensive discovery, Defendants now move for

summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure on multiple

grounds: (1) Plaintiff cannot establish any federal claims against the named defendants; (2) Plaintiff

cannot maintain his New York state claims against any of named defendants; and (3) the New York

City Police Department and New York City Fire Department Emergency Services Division are not

suable entities.  The Court finds that Plaintiff fails to establish any constitutional violations by the named Defendants, and dismisses Plaintiff's Complaint in its entirety.

**DISCUSSION**

I. STANDARD ON A MOTION FOR SUMMARY JUDGMENT

Summary judgment shall be granted only where "there is no genuine issue of material fact," so the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking summary judgment has the burden of demonstrating that no genuine issues of material fact exist. Powell v. National Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004) (quoting Adickes v. S.H.Kress & Co., 398 U.S. 144, 157 (1970)).  In determining whether a genuine issue of material fact exists, the Court must examine all evidence in the light most favorable to the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (2002); Make the Road by Walking, Inc. v. Turner, 378 F.3d 133, 142 (2d Cir. 2004).  If the moving party establishes the absence of a genuine issue of material fact, "a limited burden of production shifts to the nonmovant, who must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.'" Powell, 364 F.3d at 84 (quoting Aslanidis v. United States Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993)).  Bare allegations are not sufficient. Id.  If the nonmoving party fails to meet this limited burden, summary judgment must be granted. Id.

II. FEDERAL CLAIMS UNDER 42 U.S.C. § 1983

A. Establishing a Claim Under 42 U.S.C. § 1983

Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance,
> regulation, custom, or usage of any State or Territory, subjects, or
> causes to be subjected, any citizen of the United States or other
> person within the jurisdiction thereof to the deprivation of any
> rights, privileges, or immunities secured by the Constitution and
> laws, shall be liable to the party injured in an action at law, suit in
> equity, or other proper proceeding for redress.

42. U.S.C. § 1983.  Although 42 U.S.C. § 1983 creates no substantive rights, the statute provides

a remedy for deprivations of rights established elsewhere. See Baker v. McCollan, 443 U.S. 137,

140, 144 n. 3 (1979).  To state a viable claim under § 1983, a plaintiff must show both that he

was deprived of a right guaranteed by the Constitution or laws of the United States and that the

deprivation was committed by a person acting under color of state law. See Flagg Bros., Inc. v.

Brooks, 436 U.S. 149, 156 (1978); Pitchell v. Callan, 13 F.3d 545, 547 (2d Cir. 1994).

B. Claims Against Lieutenant Siev

1. *False arrest in violation of the Fourth Amendment*

A § 1983 claim for false arrest rests on the Fourth Amendment right of an

individual to be free from unreasonable seizures, which includes a right not to be taken into

custody by police officers without probable cause.[1] See Weyant v. Okst, 101 F.3d 845, 852 (2d

---

[1] While Dr. Warheit was not actually arrested, in the traditional sense of being taken to a police
station and charged with a crime, once Lieutenant Siev took his arm and escorted him out of the
Stuyvesant triage center Dr. Warheit was under some restraint.  At oral argument, Corporation Counsel
conceded that Dr. Warheit was "in custody." (Jan. 26, 2006, Oral Arg. Tr. 4:2-4), even though Defense
Counsel argued that Dr. Warheit was not arrested. (Id. at 20: 13-14.)  Since the Court assumes all facts in
favor of the non-moving party, the Court will assume that Dr. Warheit was in custody for purposes of the
false arrest claim.

Cir. 1996). A federal civil rights claim for false arrest will not lie, however, if the officer had

probable cause at the time of the seizure to believe that an offense has been or is in the process of

being committed. See Devenpeck v. Alford, 543 U.S. 146, 152 (2004); Singer v. Fulton County

Sheriff, 63 F.3d 110, 119 (2d Cir.1995). The existence of probable cause should be analyzed

in light of "facts known to the arresting officer *at the time of the arrest*," Devenpeck, 543 U.S. at

152 (emphasis added), not with the benefit of hindsight. The question is whether the officers had

"knowledge or reasonably trustworthy information" sufficient for competent, reasonable officers

to agree that probable cause existed. See Weyant, 101 F.3d at 852 (citing Singer, 63 F.3d at 118-

19, and Moore v. Comesanas, 32 F.3d 670, 673 (2d Cir.1994)); O'Neill v. Town of Babylon, 986

F.2d 646, 650 (2d Cir.1993). In determining whether probable cause existed, the arresting

officer's state of mind is irrelevant; in other words, "his subjective reason for making the arrest

need not be the criminal offense as to which the known facts provide probable cause."

Davenpeck, 543 U.S. at 153.

        In the instant case, there is no doubt the facts available to Lieutenant Siev on

September 13, 2001 were quite sufficient for a person of reasonable caution to believe that the

probable cause existed. As of September 13, 2001, Dr. Warheit admits perimeter security at

Ground Zero had increased. (Warheit Dep. 88-89). Proper identification was required of all

individuals seeking entrance to the area around Ground Zero, including the Stuyvesant trauma

center.[2] Both National Guard soldiers and police officers were stationed at Chambers Street to

---

        [2] Dr. Warheit attempts to downplay the fact that he did not have proper identification by arguing
that proper identification was not actually required on September 13, 2001 to remain at the Stuyvesant
trauma center. Dr. Warheit supports this proposition by submitting affidavits from two other medical
volunteers who were present at the Stuyvesant trauma center on September 13, 2001 who claim that they
also did not have proper identification. But the testimony of these witnesses actually undermines, rather

secure the Ground Zero perimeter and to keep trespassers out.  In fact, Dr. Warheit admitted in

his deposition that National Guard soldiers at the Chambers Street checkpoint initially denied

him entry, telling him that he did not have the proper identification to gain access to Ground

Zero.  He also admitted that at the time Lieutenant Siev escorted him from the building, he did

not have the proper identification to remain at the trauma center.  Thus, by his own account, Dr.

Warheit was trespassing, thereby giving Lieutenant Siev probable cause to believe that Dr.

Warheit should be removed from the building.

Dr. Warheit's own behavior at the time of his removal only bolstered the

reasonableness of Lieutenant Siev's actions.  Even if Dr. Warheit was completely calm and

rational at the time that Lieutenant Siev approached, as he now claims, the fact remains that he

did not leave the building when asked to do so.  Instead, Dr. Warheit attempted to explain

himself, insisting that he was a volunteer and that he wanted to stay at the trauma center.

According to Lieutenant Siev, Dr. Warheit "was rambling . . . and very excited," and appeared

disturbed. (Siev Dep. 11:21-25, 18:17-24.)  In light of this reaction, and coupled with Dr. Abad's

complaint that Dr. Warheit was causing a disturbance (a complaint that Lieutenant Siev testified

was confirmed by other doctors), it was reasonable for Lieutenant Siev to conclude that it was

necessary to remove Dr. Warheit from the building, and to use reasonable physical restraint to do

than supports, Dr. Warheit's position.  Ayal Lindeman explained at his deposition that he had worked in
other disaster relief efforts and therefore had a FEMA identification tag. (Lindeman Dep. 11:14, Dec. 17,
2004.)  Frank Fasano explained during his deposition that until October 2001 he was an army reservist,
and therefore he had a military identification card. (Fasano Dep. 32:25, June 14, 2005.)  Thus, both
witnesses had federal government-issued identification, which was sufficient at the time to gain access to
Ground Zero; Dr. Warheit had nothing of the sort.  No reasonable jury could find that the Stuyvesant
trauma center was not a secure area on September 13, 2001 or that Dr. Warheit should be permitted to
stay there without identification.  Dr. Warheit's bald assertions to the contrary are not sufficient to create
a genuine issue of fact.

so.

In an attempt to turn the situation on its head, Dr. Warheit now claims that it was unreasonable for Lieutenant Siev to credit Dr. Abad's complaint without first investigating whether Dr. Abad was a doctor. Of course, there was no reason for Lieutenant Siev to believe that Dr. Abad was anything but a doctor. It must be remembered that it was Dr. Warheit who admittedly lacked the appropriate credentials and his purpose was to obtain proper identification. When there was a disruption, Lieutenant Siev was summoned. Lieutenant Siev did not rely solely on Dr. Abad's comment in deciding to remove Dr. Warheit. When he approached, Lieutenant Siev believed Dr. Warheit to be acting strangely, "talking at anybody" and "rambling" incoherently. (Siev Dep. 18:17-24.) Based on his own observations of Dr. Warheit, then, Lieutenant Siev determined that probable cause existed to remove Dr. Warheit from the area.

When Lieutenant Siev escorted Dr. Warheit off the premises, he was doing the job he had been assigned to do; he had reasonably trustworthy information to conclude that Dr. Warheit was trespassing and would not leave without the appropriate escort off the premises. Given the undisputed facts in the record, competent, reasonable officers would agree that probable cause existed. Since there was probable cause, Dr. Warheit's Fourth Amendment false arrest claim against Lieutenant Siev is dismissed.

### 2. Use of excessive force in violation of the Fourth Amendment

The first step in addressing a § 1983 action for excessive force is identifying the specific constitutional violation that resulted from the challenged application of force. See Graham v. Connor, 490 U.S. 396, 394 (1989). Where an arrest is the underlying basis of an excessive force claim, "it is most properly characterized as one invoking the protections of the

Fourth Amendment, which guarantees citizens the right 'to be secure in their persons . . . against unreasonable . . . seizures' of the person." Id.

Whether a particular seizure is reasonable depends on both when and how the seizure is executed. Id. at 395. This involves a "careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests'' against the countervailing governmental interests at stake. Id. at 396. The reasonableness inquiry must be determined from the perspective of a reasonable officer at the scene of the incident. Id. The Supreme Court has long recognized that under the Fourth Amendment, officers have the right to use some degree of physical coercion or threat when making an arrest. Id. (citing Terry v. Ohio, 392 U.S. 1, 22-27 (1968)). In order for this physical coercion to rise to the level of a constitutional violation, the deprivation alleged must be "objectively sufficiently serious or harmful enough" to warrant liability, United States v. Walsh, 194 F.3d 37, 50 (2d Cir.1999); "a de minimis use of force will rarely suffice to state a constitutional claim." Romano v. Howarth, 998 F.2d 101 (2d Cir.1993)). The Supreme Court has also cautioned that:

> Because "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation," the reasonableness of the officer's belief as the appropriate level of force should be judged from that on-scene perspective.

Saucier v. Katz, 533 U.S. 194, 204 (2001) (quoting Graham v. Connor, 490 U.S. 386, 396-97 (1989) (internal citations omitted)). Therefore, reviewing courts should avoid "the '20/20 vision of hindsight' in favor of deference to the judgment of reasonable officers on the scene." Id.

Considering the need for enhanced security at Ground Zero, and the need for order in an indescribably chaotic, post-terrorist attack environment, even when viewing the facts in the

light most favorable to the plaintiff, the Court finds no evidence that Lieutenant Siev used unreasonable force to remove Dr. Warheit from Stuyvesant High School.

In escorting Dr. Warheit out of the building, Lieutenant Siev held Dr. Warheit's hands behind his back and, at one point, hit Dr. Warheit in the chest. (Warheit Dep. 95-98). This does not amount to excessive force. At the time of the incident, Lieutenant Siev believed Dr. Warheit to be a mentally disturbed individual impersonating a doctor. He had been told by a man in "trauma-type garb" that Dr. Warheit was causing a disturbance and had personally observed Dr. Warheit "rambling" excitedly and refusing to leave the area. At that moment, a reasonable officer would believe that some level of physical restraint was necessary to escort Dr. Warheit out of the building and, in the process, protect himself and others in the vicinity. Even if hindsight revealed Lieutenant Siev's understanding to be erroneous, it is of no moment. The proper inquiry is whether the officer's judgment was reasonable "from an on-scene perspective." No reasonable juror could find, on the facts known to Lieutenant Siev on September 13, 2001, that his decision to physical restrain Dr. Warheit was unreasonable, and therefore amounts to excessive use of force in violation of Dr. Warheit's constitutional rights.

Regardless, any force used by Lieutenant Siev in escorting Dr. Warheit out of the building and into an ambulance was de minimis. All Lieutenant Siev did was hold Dr. Warheit's hands behind his back. This is a common method of escorting a suspect. While Dr. Warheit complaints that Lieutenant Siev hit him in the chest, he admitted in his deposition that Lieutenant Siev hit him to make him straighten up, as Dr. Warheit was walking in a hunched-over position.

An eyewitness to the event described the interaction as so peaceful that he though the two were just talking; it never occurred to the witness that Dr. Warheit was being removed from the building against his will.

Furthermore, Lieutenant Siev's action caused no physical injury to Dr. Warheit. A physical examination performed at Bellevue only days after the incident revealed no broken bones, bruises, abrasions, or edemas. (Najib Decl., Ex. L.)  Then, x-rays performed at the V.A. Hospital after Dr. Warheit's release from Bellevue confirmed that "[n]othing was broken." (Warheit Dep. 100:10-101:12.)  Dr. Warheit himself described his "injuries" as "soreness" and "strain," and believed the injuries to be so insignificant that he never followed up with his treating physician.  (Id. 100:10-14, 140:18.)  On this evidence, no reasonable jury could find that the force used by Lieutenant Siev was "excessive."  Any force was de minimis, and therefore does not amount to a constitutional violation.  As such, Dr. Warheit's Fourth Amendment excessive force claim against Lieutenant Siev is dismissed.

C. False Imprisonment Claim Against Dr. Abad

Dr . Warheit federal claim against Dr. Abad appears to be a claim of false imprisonment in violation of his liberty rights.  This claim is based on Dr. Warheit's allegations that Dr. Abad ordered Lieutenant Siev to arrest Dr. Warheit and then ordered him involuntarily committed to Bellevue. (Compl. ¶ 2).  While Dr. Warheit is correct that the "[e]rroneous commitments . . . implicate the individual's interest in liberty," Goetz v. Crosson, 967 F.2d 29, 33 (2d Cir. 1992), there is no evidence, other than Dr. Warheit's own conclusory allegations, that Dr. Abad was in any way responsible for Dr. Warheit's arrest and subsequent commitment to Bellevue.  Therefore, Dr. Warheit cannot bring a § 1983 claim against Dr. Abad for this conduct.

In order to sustain a § 1983 claim against an individual, a plaintiff must established that the named defendant was "directly and personally responsible for the purported unlawful conduct." Alfaro Motors, Inc. v. Ward, 814 F.2d 883, 886 (2d Cir. 1987); accord Williams v. Smith, 781 F.2d 319, 323 (2d Cir. 1986). Failure to establish the defendant's direct involvement in the allegedly unconstitutional acts is fatal to the plaintiff's claim. See Alfaro Motors, 814 F.2d at 886; Williams, 781 F.2d at 323. Even when drawing all reasonable inferences in the light most favorable to Dr. Warheit, a reasonable jury could not find that Dr. Abad was personally involved in Dr. Warheit's transfer to, and subsequent involuntary commitment to, Bellevue. While Dr. Abad undoubtedly summoned Lieutenant Siev, each subsequent act of which Dr. Warheit complains had an independent cause that cannot be attributed to Dr. Abad. Lieutenant Siev made his own independent determination to remove Dr. Warheit. Lieutenant Siev independently escorted Dr.Warheit into the ambulance and told the driver to take Dr. Warheit to Bellevue. Even if Dr. Abad told Dr. Warheit he should go to Bellevue for observation, as Dr. Warheit now claims, there is no evidence that Dr. Abad relayed this statement to Lieutenant Siev or the ambulance driver who eventually drove him there. Dr. Warheit's subsequent commitment at Bellevue was done by doctors who had no contact with Dr. Abad. They made their own independent determination, after consulting with Dr. Warheit's treating psychiatrist. There is no evidence that Dr. Abad treated Dr. Warheit at Bellevue or was consulted in any way.

No reasonable jury could find on this record that Dr. Abad falsely imprisoned Dr. Warheit at Bellevue in violation of his Fourth or Fourteenth Amendment rights. Dr. Abad's professional affiliation with Bellevue is not sufficient, by itself, to create a disputed issue of fact

as to whether Dr. Abad was involved in Dr. Warheit's case. Accordingly, Dr. Abad is entitled to summary judgment as a matter of law.

It is also important to note that, even if Dr. Abad was personally responsible for Dr. Warheit's arrest, his § 1983 claim would still fail. To prevail on a claim under § 1983, a plaintiff must establish that the defendant was acting under color of state law. See 42 U.S.C. § 1983; Flagg Bros., 436 U.S. at 156. It is by now well settled that "acts of [state officials] in the ambit of their personal pursuits are plainly excluded." Screws v. United States, 325 U.S. 91, 111 (1945), quoted in Pitchell v. Callan, 13 F.3d 545, 548 (2d Cir. 1994). While Dr. Abad worked for Bellevue, a city-run hospital, there is no evidence that he acted in his official capacity as a Bellevue psychiatrist when he told Lieutenant Siev to remove Dr. Warheit from the Stuyvesant High School trauma center. Dr. Abad did not introduce himself to Lieutenant Siev; and there is no reason to believe that Lieutenant Siev knew Dr. Abad's affiliation with Bellevue. Thus, Plaintiff has failed to establish that Dr. Abad invoked either the real or apparent government power when he acted, rendering his claim against Dr. Abad inadequate as a matter of law.

Dr. Warheit's reliance on Rodriguez v. City of New York, 72 F.3d 1051 (2d Cir. 1995) to support liability against Dr. Abad is misplaced. Rodriguez recognized that involuntary commitment is a "massive curtailment of liberty," and therefore a doctor may not commit a patient to a mental hospital without due process. See Rodriguez, 72 F.3d at 1061-66. The problem with applying Rodriguez to Dr. Abad is obvious. As previously explained, there is no evidence from which a reasonable jury could find that Dr. Abad made the decision to send Dr. Warheit to Bellevue or admit him once he was there. Dr. Lightdale, Dr. Levine and Dr. Pandya, the three doctors who did make the decision to admit Dr. Warheit to Bellevue and hold him

there, have all been dismissed from this case.  Dr. Warheit cannot transfer liability to Dr. Abad to compensate for this decision.

D. Claims Against New York Health & Hospitals Corporation and Bellevue Hospital

Dr. Warheit fails to identify the exact nature of his federal claims against the New York City Health & Hospitals Corporation ("HHC") and Bellevue.  Construing his complaint and opposition papers liberally, however, Dr. Warheit appears to plead negligence, medical malpractice and cruel and unusual punishment in violation of the Eighth Amendment. (<u>See</u> Complaint ¶ 42.)

*1. Negligence and medical malpractice claims against HHC and Bellevue*

Section 1983 redresses the deprivation of federal rights.  It is "not to be used to duplicate state tort law at the federal level." <u>Sha v. Memorial Sloan-Kettering Cancer Center</u>, No. 99 Civ. 3233, 2000 WL 176883, at *2 (S.D.N.Y. Nov. 30, 2000); <u>accord</u> <u>McMillian v. Dewell</u>, No. 06 Civ. 202, 2006 WL 1304800, at *2 (N.D.N.Y. May 10, 2006); <u>Obunugafor v. Borchert</u>, No. 01 Civ. 3125, 2001 WL 1255929, at *2 (S.D.N.Y. Oct. 19, 2001).  Claims for negligence and medical malpractice are governed by state law. <u>See</u> <u>Sha</u>, 2000 WL 176883, at *1.  They are neither created by federal law nor dependent on it.  As such, "[a]llegations of medical malpractice or negligen[ce] . . . will not suffice to support an action under 42 U.S.C. § 1983." <u>Sha</u>, 2000 WL 176883, at *2 (quoting <u>Owens v. Bellevue Hosp. Ctr.</u>, No. 95-9016, 1996 WL 134227, at *1 (2d Cir. Mar. 25, 1996) (unpublished decision)); <u>accord</u>  <u>Obunugafor</u>, 2001 WL 1255929, at *2;  <u>Tomarkin v. Ward</u>, 534 F. Supp. 1224, 1228 (S.D.N.Y. 1982) (citing <u>United States ex rel. Hyde v. McGinnis</u>, 429 F.2d 864, 866 (2d Cir. 1970)); <u>see also Daniels v. Williams</u>, 474 U.S. 327 (1986) (holding that mere negligence is not actionable under  § 1983).  Rather,

"[t]o covert what would be malpractice if tortious in a private context into a constitutional violation in the state agency employee context requires deliberate indifference." Obunugafor, 2001 WL 1255929, at *2 (quoting Morris v. Hoke, No. 87 Civ. 7812, 1992 WL 310792, at *1 (S.D.N.Y. Oct. 21, 1992)); accord Estelle v. Gamble, 429 U.S. 97, 106 (1976); Bryant v. Maffucci, 923 F.2d 979, 983 (2d Cir. 1991) (citing Daniels v. Williams, 474 U.S. 327, 333 (1986)). The facts of Dr. Warheit's case do not rise to level of deliberate indifference.

### 2. Eight Amendment claim against HHC and Bellevue

In addition to his claims of medical malpractice and negligence, Plaintiff alleges that HHC and Bellevue are liable for violating the Eighth Amendment of the Constitution. (Pl.'s Mem. Law Opp'n 21.) The Eighth Amendment protects individuals who have been convicted of crimes against "cruel and unusual punishment." The language of the this amendment has been construed as "manifest[ing] 'an intention to limit the power of those entrusted with the criminal-law function of government.'" Whitley v. Albers, 475 U.S. 312, 318-19 (1986). Thus, the Eighth Amendment "applies only after conviction." Katzman v. Kahn, 67 F.Supp.2d 103, 109-10 (E.D.N.Y. 1999) (citing Whitley v. Albers, 475 U.S. 312, 318-19 (1986)), aff'd, 242 F.3d 365 (2d Cir. 2000).

Dr. Warheit's attempts to characterize his involuntary commitment as criminal in nature by arguing that his "confinement at Bellevue for five days was tantamount to imprisonment" misses the point. The Eighth Amendment applies only to imprisonment pursuant to a criminal conviction. See DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 199 (1989) ("[T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance

with due process of law.").  Therefore, "[t]he involuntary commitment of mentally ill individuals does not constitute punishment for purposes of the Eighth Amendment." Vallen v. Carrol, No. 02 Civ. 5666, 2005 WL 2296620, at *9 (S.D.N.Y. Sept. 20, 2005); accord Lombardo v. Stone, No. 99 Civ. 4603, 2001 WL 940559, at *7 (S.D.N.Y. Aug. 20, 2001).  Instead, the proper inquiry is one under the Fourteenth Amendment. See Vallen, 2005 WL 2296620, at *9; Lombardo, 2001 WL 940559, at *7; see also County of Sacramento v. Lewis, 523 U.S. 833, 849 (1998) (explaining lower "deliberate indifference" standard under Fourteenth Amendment "substantive due process").  Accordingly, Dr. Warheit's Eighth Amendment claim is dismissed.

### 3. Involuntary Commitment in Violation of the Fourteenth Amendment

While Dr. Warheit erroneously pleads deliberate indifference in violation of the Eighth Amendment, reading Dr. Warheit's pleadings and opposition papers liberally, Dr. Warheit alleges a denial of substantive and procedural due process in violation of the Fourteenth Amendment, as set forth in Rodriguez v. City of New York, 72 F.3d 1051 (2d Cir. 1995). (See Pl.'s Mem. Law Opp'n Summ. J. 18-20, 21).  Rodriguez held that "an involuntary commitment is a 'massive curtailment of liberty,'" and therefore "cannot permissibly be accomplished without due process of law." 72 F.3d at 1061 (quoting Vitek v. Jones, 445 U.S. 480, 491 (1980)).  "As a substantive matter, due process does not permit the involuntary hospitalization of a person who is not a danger either to herself or to others." Id.  "[A]s a procedural matter, due process does not permit continuation of a challenged involuntary civil commitment without a hearing."[3] Id. at 1062.  The Rodriguez court explained, however, that "due process does not require a guarantee

---

[3] While the Rodriguez court goes on to establish a "clear and convincing standard," the court later explains that the clear-and-convincing standard of proof does not apply to emergency commitments. See. id.

that a physician's assessment of the likelihood of serious harm be correct," but only that the decision "be made in accordance with a standard that promises some reasonable degree of accuracy." Id. Thus, if Dr. Warheit's case were against Dr. Lightdale, Dr. Levine, and Dr. Panda, the three physicians who made the decision to involuntarily commit Dr. Warheit on September 13, 2001 and keep him there for five days, the question would be whether the conduct of the individual doctors in committing Dr. Warheit on an emergency basis was objectively reasonable or fell so substantially below the generally accepted medical standard that it denied Dr. Warheit due process of law. The Court need not entertain this question, however, because Dr. Warheit's claim is not against the individual doctors. All three physicians have been dismissed from the case. Instead, Dr. Warheit's claim is against two municipal entities: HHC and Bellevue. See Rookard v. Health & Hosp. Corp., 710 F.2d 41, 45 (2d Cir. 1983) (noting that HHC is a municipal corporation subject to Monell analysis).

Under Monell v. Department of Social Services, 436 U.S. 658 (1978), a plaintiff suing a municipal entity such as HHC or Bellevue may withstand summary judgment only if the plaintiff can establish that "the constitutional wrong complained of resulted from the corporation's official policy, custom, ordinance, regulation, or decision." Rookard, 710 F.2d at 45 (citing Monell, 436 U.S. 691-94.) In essence, "municipalities such as the City of New York may only be held liable when the city *itself* deprives an individual of a constitutional right," Davis v. City of New York, 228 F.Supp.2d 327, 336 (S.D.N.Y. 2002), and may not be held liable on a respondeat superior theory for the acts of its agents. Monell, 436 U.S. at 691.

To ensure that a municipality is not "held liable solely for the actions of its employee," courts must apply "rigorous standards of culpability and causation." Board of County

Comm'rs v. Brown, 520 U.S. 397, 405 (1997). "[P]roof that the corporation employed a tortfeasor will not, standing alone, establish liability," Rookard, 710 F.2d at 45; nor will a single incident of unconstitutional conduct by a non-policymaking employee of the state suffice to establish liability. See Davis, 228 F.Supp.2d at 336 (citing Oklahoma City v. Tuttle, 471 U.S. 808, 831 (1985)). To constitute a "policy," either the corporation must promulgate an official policy, as that term is commonly understood (i.e., a formal measure by the governing body) or a municipal employee with final policymaking authority in a certain area must undertake the unconstitutional act. See id. at 337. A municipal "custom," by contrast, does not require official sanction. "[A]n act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." Id. (quoting Brown, 520 U.S. at 404). The practice must be widespread and permanent, see id. (citing City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988)), and "so severe as to constitute 'gross negligence' or 'deliberate indifference' to a plaintiff's rights," Sarus v. Rotundo, 831 F.2d 397, 401 (2d Cir. 1987).

Reconciling Rodriguez and Monell, in order to establish a § 1983 claim against HHC or Bellevue, Dr. Warheit would have to establish a policy or custom by HHC or Bellevue to involuntarily commit patients to the hospital in violation of their substantive and procedural due process rights. This would require proof of a written directive or regulation by HHC or Bellevue, an act by an policymaking employee at HHC or Bellevue, or a practice so widespread that it has the force of law at HHC or Bellevue. Dr. Warheit establishes none of these. All Dr. Warheit pleads is that a number of physicians at Bellevue, none of whom worked in a

policymaking capacity, committed him to Bellevue on an emergency basis pursuant to New York's Mental Hygiene Law where he was held until a court ordered his release. A single incident by persons without policymaking authority cannot create liability under <u>Monell</u>.[4] Were the Court to hold differently, it would in essence be holding HHC and Bellevue liable in <u>respondeat</u> <u>superior</u> for the conduct of its employees. This is exactly what <u>Monell</u> forbids.

E. Claims Against City of New York

For the same reason that Dr. Warheit's Fourteenth Amendment Due Process claims against the HHC and Bellevue fail, his claims against the City of New York must fail: there is no evidence in the record of a municipal policy or custom. Dr. Warheit's theory of liability against the City appears to be a municipal custom or policy by New York city police officers of sending people to Bellevue, knowing that they will involuntarily committed once they arrive. Dr. Warheit further alleges that the City should be liable for his detention at Bellevue because there is a custom of bringing individuals to Bellevue and keeping them there for an excessive amount of time. Neither argument has any merit. Dr. Warheit points to no evidence, other than his own speculation, that such a custom or policy exists. The September 13, 2001

---

[4] While Dr. Warheit suggests a widespread practice of committing individuals to Bellevue in violation of their constitutional rights, Dr. Warheit provides no evidence, other than his own bare allegations, that such a policy exists. While mere allegations may be sufficient to withstand a motion to dismiss, at the summary judgment stage plaintiff has a higher burden. As this Circuit explained, "[a]n 'opposing party's facts must be material and of a substantial nature, not fanciful, frivolous, gauzy, spurious, irrelevant, gossamer inferences, conjectural, speculative, nor merely suspicions.'" <u>Opals on Ice Lingerie v. Body Lines Inc.</u>, 320 F.3d 362, 370 n.3 (2d Cir. 2003) (quoting <u>Contemporary Mission v. U.S. Postal Serv.</u>, 648 F.2d 97, 107 n.14 (2d Cir. 1981)). Dr. Warheit provides no documents, affidavits, or other concrete evidence from which a reasonable jury could find that such a practice actually exists. His bare speculation does not suffice to withstand summary judgment.

incident leading to Dr. Warheit's commitment alone is not sufficient to create municipal liability under Monell.[5]   Accordingly, Dr. Warheit's claims against the City of New York are dismissed.

F. Claims Against the New York Police Department and New York Fire Department

A governmental entity may not be sued in its individual capacity absent express consent from the state.  "The State of New York has neither expressly given nor necessarily implied that the NYPD, FDNY or EMS can sue or be sued in their individual capacities." Parker v. DeBuono, No. 98 Civ. 5765, 1999 WL 771365, at *2 (S.D.N.Y. Sept. 28, 1999).  In fact, the New York City Charter expressly mandates that "actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the City of New York and not in that of any agency." N.Y. City Charter § 396.  Thus, Plaintiff cannot sue the NYPD or FDNY for monetary damages under § 1983.  Accordingly, Plaintiff's claims against the NYPD and FDNY must be dismissed.

III. STATE LAW CLAIMS

Having dismissed Plaintiff's underlying federal claims, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims. See 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if ... the district court has dismissed all claims over which it has original

---

[5] Dr. Warheit's reliance on Kerman v. City of New York, 374 F.3d 93 (2d Cir. 2004) is misplaced.  In Kerman, the police officers ordered that the plaintiff be detained and taken for psychiatric examination, but the police officers had ignored or deliberately avoided obtaining information from plaintiff's psychiatrist.  Here, the opposite happened.  Lieutenant Siev had no contact with Bellevue; and there is no evidence that he played any role in Dr. Warheit's treatment or commitment at Bellevue. Indeed, Dr. Warheit argues that no doctors from the hospital called Ground Zero to find out what had happened. (Tr. Oral Argument, January 26, 2006, pg. 24: 19-25.) The doctors, however, did call Dr. Warheit's treating psychiatrist, who recommended that Dr. Warheit be medicated and committed. (Najib Aff. Ex. L.)

jurisdiction."). Accordingly, the state law claims are dismissed, without prejudice to renewal in
the proper state court.

## CONCLUSION

For the foregoing reasons, Plaintiff's federal claims brought pursuant to 42 U.S.C.

§ 1983 are DISMISSED with prejudice for failure to establish the violation of a federal right.

The Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state-law

claims. The Clerk of the Court is directed to close out this case.

Dated: New York, New York
       August 15, 2006

SO ORDERED,

PAUL A. CROTTY
United States District Judge

Copies mailed to:

Stuart Randall Shaw
Stuart R. Shaw, Attorney At Law
9 East 67th Street, Suite 1a
New York, NY 10021

Mona Vivian Najib
New York City Law Department
100 Church Street
New York, NY 10007